THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* JEFFREY J. FOX, Defendant-Appellee.

Second District    No. 80-625

Opinion filed June 5, 1981.

Dennis Schumacher, State's Attorney, of Oregon, for appellant.

No brief filed for appellee.

Mr. JUSTICE VAN DEUSEN delivered the opinion of the court:

The State appeals from the trial court's order granting the defendant's motion to suppress.

On October 13, 1979, at approximately 7:30 p.m. three Ogle County deputy sheriffs stopped the automobile in which the defendant, Jeffrey J. Fox, was riding as a passenger. As a result of the stop and resultant search of the car and the defendant's person, the defendant was subsequently charged with the unlawful possession of a hypodermic syringe and cannabis. The defendant filed a motion to suppress all evidence seized subsequent to the stop and all incriminating statements which he made thereafter.

After holding a hearing on the motion, the trial court granted the motion to suppress. The court's order found that law enforcement

officials did not possess specific and articulable facts which, when combined with rational inferences from those facts, reasonably warranted the stop. This appeal followed.

During the suppression hearing the trial court heard the testimony of two witnesses for the defendant and three witnesses on behalf of the State. The testimony of the State's witnesses was substantially different in important aspects from that proffered by the defendant's witnesses. It is undisputed, however, that the Ogle County deputy sheriffs did not possess a search warrant for the vehicle or for the defendant and that neither the defendant nor the driver of the vehicle in question consented to a search.

Jeffrey Daniels was driving a 1973 Dodge Colt station wagon at approximately 7:30 p.m. on the evening in question. He was accompanied by the defendant. Daniels was driving northbound on River Road in Ogle County when he turned into an area described as "the boat docks," which parallels River Road. He drove north past the boat docks to the north entrance to the area, turned south onto River Road and returned in the direction from which he had come. He did not stop at the boat docks or in the area. He stated that it was fairly dark at the time and that he had turned on his lights before entering the boat docks. As Daniels started to drive south on River Road, two police cars turned on their lights and pulled his vehicle over to the side of the roadway. The police shined their flashlights inside his vehicle and asked the defendant to hand them a metal tray, which was on the car's dashboard and inside the open glove compartment. The tray contained a "roach." The defendant complied with this request. The police then searched Daniels, the car and the person of the defendant. The officers found a hypodermic syringe on the defendant's person. Daniels, who was not arrested, testified that he had not violated any traffic laws.

The defendant, a passenger in Daniels' vehicle, related that Daniels was driving northbound on River Road when he turned his vehicle from River Road into the boat docks area, proceeded slowly through the area without parking and then turned south onto River Road. Daniels did not stop his car while driving in the boat docks area except to check for traffic before leaving the area via River Road. Defendant stated that no squad car entered the boat docks area prior to their exiting the area via River Road. While traveling south on River Road, the defendant observed two northbound squad cars on River Road, which turned around, activated their overhead lights, and halted Daniels' vehicle.

According to the defendant, a police officer tapped the passenger window with a flashlight and asked the defendant to hand him the metal tray on the car's dashboard. The defendant complied and then exited the car at the officer's request. The officers then searched the defendant's

jacket and person and found a hypodermic syringe and "a little bit of hash" in the pockets of the jacket. The defendant was placed under arrest and immediately transported directly to the Ogle County jail where he gave a statement or confession, after having been advised of his *Miranda* rights, regarding the items which had been recovered from his jacket. He was questioned at the jail shortly after he had been fingerprinted and photographed.

Anthony Russell, a deputy for the Ogle County sheriff's department, testified that he was traveling northbound on River Road in a marked squad car on the evening in question. Sergeant Keith Charvat and Deputy Daryl Brass were in another marked squad car directly in front of him. It was completely dark outside. Russell related that he, Charvat and Brass were going to the boat docks area to patrol it because of numerous previous reports, some as recent as a week prior to the incident in question, of persons "partying and littering in the area." According to Russell, the vehicle driven by Charvat and Brass turned into the boat docks area and proceeded northbound. As Charvat's vehicle proceeded northbound, it approached another vehicle which was parked at the north end of the area. As the squad car approached within 50 to 75 feet of the parked car, the subject vehicle turned on its headlights, accelerated out of the area and proceeded south on River Road. According to Deputy Russell, this vehicle accelerated at a greater than reasonable speed in departing the boat docks area. Russell stopped the vehicle at the south entrance to the boat docks at which time he observed both Jeffrey Daniels and the defendant in the front seat of the car.

Deputy Russell also testified that he then asked the driver to roll down his car window, which Daniels did. At this time Russell, who had been trained to detect the odor of cannabis, smelled the odor of a substance he believed to be cannabis coming from the interior of the vehicle. He also looked into the car and observed a small, open metal tray directly in front of the defendant which contained a small amount of a green, leafy substance that Russell thought to be marijuana and several cigarette butts he believed to be the remnants of hand-rolled marijuana cigarettes.

Both Sergeant Charvat and Deputy Brass corroborated the testimony of Deputy Russell concerning the events which preceded and led to the stopping of the subject vehicle. In addition, Deputy Brass related that he conducted a "pat-down" search of the defendant's person after he exited Daniels' vehicle. As he was conducting the search, he discovered a hypodermic syringe and a brown powdered substance in a tin foil container in the pocket of the jacket that the defendant was wearing. He arrested the defendant at the scene of the stop for possession of a hypodermic syringe. The deputy also testified that he questioned the defendant at the Ogle County jail after first advising him of his *Miranda* rights. The defendant

verbally acknowledged that he understood his rights and answered the deputy's questions.

On appeal, the State contends that, given the circumstances of this case, the police officers conducted a valid investigatory stop of the car in which the defendant was a passenger. Consequently, the State asserts that, since a valid investigatory stop had been made, the subsequent warrantless searches of the defendant and the vehicle were justified because the officers became aware of certain facts after the stop which gave them probable cause to conduct the searches.

■■ At the suppression hearing the defendant argued, in essence, that the stop of the automobile in which he was riding was improper and hence the resultant nonconsensual, warrantless search of his person violated his State and Federal constitutional right to be free from unreasonable searches and seizures. He argued below that, since the initial stop of the vehicle was improper, the physical evidence seized thereafter and the incriminating statements later obtained should be suppressed at trial. Although the defendant has not filed a brief on appeal, the court may nevertheless consider the merits of the appeal. *First Capitol Mortgage Corp. v. Talandis Construction Corp.* (1976), 63 Ill. 2d 128, 131, 133; *Super v. Armstrong* (1980), 83 Ill. App. 3d 1062, 1063-64.

■■ With respect to a motion to suppress evidence illegally seized, the burden of establishing that the search and seizure were unlawful rests on the defendant (Ill. Rev. Stat. 1979, ch. 38, par. 114—12(b); *People v. Grice* (1980), 87 Ill. App. 3d 718, 722), and the reviewing court has the duty to affirm the result reached by the trial court in a motion to suppress evidence unless the lower court's ruling was manifestly erroneous (*Grice*, at 722, and cases cited therein).

■■ It is also well established that a police officer, in appropriate circumstances and in an appropriate manner, may approach an individual for purposes of investigating possible criminal behavior where there is not probable cause to arrest, provided, however, that the officer's decision to stop is based on specific and articulable facts which, when taken together with rational inferences from those facts, reasonably warrant the investigative intrusion. (*People v. Grice* (1980), 87 Ill. App. 3d 718, 722, citing *Terry v. Ohio* (1968), 392 U.S. 1, 20-21, 20 L. Ed. 2d 889, 905-06, 88 S. Ct. 1868, 1879-80.) In determining whether a stop is reasonable, an objective standard is employed, that is, whether the facts available to the officer warrant a man of reasonable caution to believe that the action taken was appropriate; a mere suspicion or a hunch is not sufficient. *Grice* at 722-23.

The constitutional standard established in *Terry v. Ohio* has been codified in section 107—14 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 107—14), which provides that a police officer, after identifying himself as such, may lawfully stop any individual

in a public place for a reasonable period of time when he reasonably infers from the totality of the circumstances that the person is about to commit or has committed an offense. *People v. Grice* (1980), 87 Ill. App. 3d 718, 723.

■■ Applying the above principles to the facts of this case, we conclude, for the reasons set forth below, that the Ogle County law enforcement officials did not possess sufficient specific and articulable facts to warrant the investigative intrusion in the form of a *Terry* stop and that, consequently, the motion to suppress was properly granted.

The trial court, sitting as a trier of fact, was presented with conflicting testimony regarding the events of the evening in question. In particular, contrary to the assertions of the police officers, both the defendant and Jeffrey Daniels testified that Daniels had not parked or stopped his vehicle at the boat docks. Since the trial judge had an opportunity to observe the demeanor of the various witnesses and assess their credibility, he may have disbelieved the testimony of the police officers regarding whether the subject vehicle had parked in the boat docks area.

Whether he chose to believe the testimony of the defendant and his companion or the testimony of the police officers regarding whether the vehicle in question had parked before proceeding from the area when it was stopped, there were insufficient specific and articulable facts to justify the officers' believing that the occupants of the vehicle were engaged in possible criminal behavior and stopping the vehicle to investigate further. *People v. James* (1976), 44 Ill. App. 3d 300, 302-04.

This would be a closer case if the trial court accepted the version of the police officers. At the time of the stop, the investigating officers were aware that "partying and littering" had recently occurred in the boat docks area and also that the vehicle in which the defendant was riding as a passenger exited the area at a speed which one officer believed to be unreasonable upon the approach of a squad car. But, the officers testifying on behalf of the State did not relate that any additional suspicious or unusual activities that would have alerted the police to the possibility of criminality were carried on by the occupants of the automobile. For example, there was no testimony that things were being thrown from the vehicle or that the officers observed conduct which might indicate that alcohol was being consumed or drugs used. Furthermore, there is no indication in the record that Daniels or the defendant had violated any traffic laws or any other laws or ordinances.

The State's argument that the departure of Daniels' vehicle indicated, to the officers on patrol, flight to avoid apprehension for a crime is unconvincing. Deputy Russell admitted that it was completely dark outside at the time of the incident in question. It is doubtful that an objective person would have reasonably concluded that the occupants of

the subject vehicle had recognized that the approaching vehicle was a police car and were attempting to elude the police considering that the squad car had not yet activated its overhead lights and may have been as far as 75 feet from the subject vehicle at this juncture. Also, there is no evidence in the record to suggest that Daniels' vehicle was being operated in excess of the speed limit or at a high rate of speed when it was apprehended. Moreover, the mere fact that the vehicle drove away at the approach of a squad car does not serve as a justifiable basis for conducting a *Terry* stop. See *People v. James* (1976), 44 Ill. App. 3d 300, 302-04.

In short, the evidence adduced in this case does not support the State's contention that the police were aware of specific and articulable facts to justify the stop here. Rather, the evidence suggests that the police officers were operating under a suspicion or hunch that the vehicle contained someone who had committed or was about to commit a crime. Of course, a mere suspicion or hunch is insufficient to justify a warrantless stop. (*People v. Grice* (1980), 87 Ill. App. 3d 718, 723, and cases cited therein.) We conclude, therefore, that the trial court properly suppressed all physical evidence obtained as a result of the search and seizure conducted subsequent to the improper *Terry* stop.

■■ The statements obtained from the defendant following the illegal stop were also inadmissible under the principles set forth in *Dunaway v. New York* (1979), 442 U.S. 200, 218-19, 60 L. Ed. 2d 824, 839-40, 99 S. Ct. 2248, 2259, and *Brown v. Illinois* (1975), 422 U.S. 590, 601-03, 45 L. Ed. 2d 416, 426, 95 S. Ct. 2254, 2261. (Accord, *People v. McMahon* (1980), 83 Ill. App. 3d 137, 144-45; *People v. Wright* (1980), 80 Ill. App. 3d 927, 932.) Only a short period of time transpired between the constitutional violation and the resultant statements. Furthermore, the State did not produce any evidence at the suppression hearing to demonstrate the presence of significant intervening circumstances which broke the causal connection between the unconstitutional police conduct and the subsequent incriminating statements. For example, there is no evidence that the defendant was released from police custody at any time prior to questioning or that the interrogation was initiated at the request of the defendant rather than by the police. The fact that defendant was given the *Miranda* warnings is not dispositive, since the *Miranda* warnings alone and *per se* are not sufficient to attenuate or dissipate the taint of unconstitutional conduct. (*Dunaway v. New York* (1979), 442 U.S. 200, 216-17, 60 L. Ed. 2d 824, 838-39, 99 S. Ct. 2248, 2258-59; *Brown v. Illinois* (1975), 422 U.S. 590, 601-03, 45 L. Ed. 2d 416, 426-27, 95 S. Ct. 2254, 2260-61; accord, *McMahon* at 144.) Based on the record in this case, there was a sufficient causal connection between the illegality and the subsequent confession to require its exclusion from evidence. *McMahon*; *Wright*.

The State's reliance on *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870, *rehearing denied* (1980), 448 U.S. 908, 65 L. Ed. 2d 1138, 100 S. Ct. 3051, and this court's opinion in *People v. Estrada* (1979), 68 Ill. App. 3d 272, *cert. denied* (1979), 444 U.S. 968, 62 L. Ed. 2d 382, 100 S. Ct. 459, is misplaced. We reject the State's characterization of the stop in the present case "as part of a systematic, nonarbitrary check of a rural trouble spot" so that those cases are inapposite.

For the foregoing reasons, we affirm the trial court's granting of the defendant's motion to suppress. In sum, the initial stop and the subsequent warrantless searches were not conducted within the governing constitutional and statutory tests. The defendant has met his burden of establishing that the stop and the resultant searches and seizures were unlawful, and the trial court's ruling was not manifestly erroneous.

Affirmed.

UNVERZAGT and REINHARD, JJ., concur.